Claudia C. Bohorquez, Esq., SBN 150647
LAW OFFICES OF CLAUDIA C. BOHORQUEZ
A Professional Corporation
8383 Wilshire Blvd., Suite 800
Beverly Hills, CA 90211
Telephone: (323) 648-6761
Facsimile: (323) 978-6637
Email: cbohorquez@bohorquezlawgroup.com

Attorney for Plaintiff, VICTOR MANUEL GONZALEZ OSEGUERA

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VICTOR MANUEL GONZALEZ OSEGUERA, an individual (aka ABEL MACIAS CONTRERAS)<br><br>Plaintiff,<br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Negligence (Federal Tort Claims Act 28 U.S.C. §2671 et seq.) Over-detention in Custody, Failure to Provide Timely Medical Care of a Serious Medical Condition<br><br>2. False Imprisonment (Federal Tort Claims Act 28 U.S.C. §§2671 et seq.) |

Plaintiff, VICTOR MANUEL GONZALEZ OSEGUERA aka ABEL MACIAS CONTRERAS, an individual, ("Plaintiff") for his Complaint against defendant UNITED STATES OF AMERICA ("Defendant") alleges as follows:

**INTRODUCTION**

1. Plaintiff was unlawfully retained in custody beyond the end of his completed sentence in federal prison.

2. The Federal Tort Claims Act ("FTCA") provides a limited waiver of the United

-1-

FIRST AMENDED COMPLAINT

States' sovereign immunity for the negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment "under [like] circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [tortious] act or omission occurred."  28 U.S.C. §§1346(b)(1), 2674.

## VENUE AND JURISDICTION

3.  This Court has original jurisdiction over Plaintiff's FTCA claims pursuant to 28 U.S.C. §1346(b)(1) (claims against United States).

4.  Venue is proper in this Court under 28 U.S.C. §1391(e)(1)(B) because a substantial part of the incidents, events, and occurrences giving rise to the present action occurred in this district.

## PARTIES

5.   Plaintiff resides in San Francisco County, California, and sues in his individual capacity.

6.   Defendant UNITED STATES OF AMERICA ("United States") is liable under the FTCA for the acts and omissions of its employees (as described below) who were all federal employees working for the Bureau of Prisons ("BOP") and/or Designation and Sentence Computation Center ("DSCC"), agencies of the United States, and acting within the course and scope of such employment at all times relevant to this action.

## FACTUAL ALLEGATIONS

7. On September 26, 2018, Plaintiff was arrested in Siskiyou County, CA and charged with certain state offenses including being a felon in possession of a firearm and identity theft.

8.  On October 23, 2018, the United States charged Plaintiff with being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g), based on the same conduct that

-2-
COMPLAINT

prompted his arrest in Siskiyou County.

9. On October 24, 2018, Plaintiff was brought to the United States District Court – Eastern District of California where he made his initial appearance on the federal charges.

10. On April 1, 2019, Plaintiff was still being held at Sacramento County Main Jail.

11. On April 8, 2019, the federal Court ordered an evaluation of Plaintiff's mental competency to stand trial and was committed to the custody of the Attorney General.

12. On April 26, 2019, Plaintiff arrived at the BOP, Metropolitan Correctional Center (MCC) in San Diego, CA.

13. On May 14, 2019, MCC recommended Plaintiff be evaluated at a Federal Medical Center.

14.  On October 28, 2019, a Federal Court Order was issued committing Plaintiff to the custody of the Attorney General pursuant to 18 USC 4241 for treatment at a federal medical facility to ascertain capacity for proceedings to continue by federal court Order.

15. As of December 11, 2019, Plaintiff was still in custody at Sacramento County Main Jail with the likelihood of being transferred to federal facility in Springfield, Missouri by US Marshalls Service not until mid-January 2020.

16. On January 23, 2020, Plaintiff was transferred to U.S. Medical Center for Federal Prisoners ("USMCFP") in Springfield, Missouri.

17. On February 4, 2021, Plaintiff pleaded guilty to the federal charge.

18. On March 25, 2021, the U.S.D.C. Eastern Dist. of CA **federal court sentenced Plaintiff to a term of 33 months incarceration in federal prison** [i.e., 2 years and 9 months] and supervised release (probation) of 36 months for violation of 18 U.S.C. §922(g)].  At this time, the state charges in Siskiyou County remained pending.  Per U.S.S.G. §5G1.3(c) any anticipated state sentence would run concurrently to the federal sentence.

19. On May 18, 2021, Plaintiff pleaded guilty in the California Superior Court for the County of Siskiyou to a felony charge of Penal Code §114 (possession of false identity documents) and a misdemeanor charge of Penal Code 530.5(a) (identify theft). As recommended by his plea agreement, the state court sentenced him to **five years in custody (i.e., 60 months)**, **to run concurrently to any federal sentence**.

20. On June 14, 2021, Plaintiff's attorney wrote to Judge Morrison C. England Jr. in the U.S.D.C. Eastern District of California requesting a hearing to correct an error in release date projection by the BOP and to assign credit for time served. Specifically, the BOP believed Plaintiff still owed 3 years in custody because of a "technical/clerical error during his transfer of custody to federal agents wherein he was never formally placed into federal custody" (although he was in federal custody).

21. On June 30, 2021, Plaintiff arrived at FCI Victorville I in California.

22. On November 24, 2021, the federal court entered an Order approving a "Stipulation to Correct Sentence Under Fed. R. of Crim. Proc. 36; Findings and Order" which stated in relevant part, "The Court… hereby ORDERS… that the judgment entered against the defendant in this matter be amended to indicate that the 33-month term of incarceration imposed run concurrently to any state sentence arising from the same conduct as the court of conviction in this case."

23. On December 3, 2021, BOP's DSCC Analyst Tiffany Farmer's inmate sentence calculation did not reflect a correct projected release date, showing instead 11-19-23.

24. On December 29, 2021, Individualized Needs Plan Program Review documents show Plaintiff's Projected Release Date as 6-24-23 based on projected GCT Rel. method (Good Conduct Time Release).

25. On January 10, 2022, Plaintiff filed a letter to the federal U.S. District Clerk of the

-4-
COMPLAINT

Court in Case No. 2:18-cr-00219-KJM (Eastern District of CA) pleading with the court to force the BOP to adhere to his sentencing with proper time served and to provide a confirmation of his true release date.

26.  On January 19, 2022, Plaintiff submitted an "Inmate Request to Staff" form specifically to LaKeisha Kidd-Campbell requesting that she review his records and ensure that his sentences showed to be running concurrently and not consecutively so as to ensure his proper release date.  In the form, he indicates he has been waiting for an answer on this for a month.  He resubmitted the form on January 25, 2022.

27.  On February 1, 2022, Amended Judgment in a Criminal Case reflected concurrent sentencing.

28.  On May 20, 2022, suffering from serious illness, Plaintiff was hospitalized outside of the prison.

29.  On July 27, 2022, Sentence Monitoring Computation Data still showed a **projected release date of 6-24-23**, when he should have been released by at least March 25, 2021, if not earlier.

30.  On September 19, 2022, a Stipulation was entered into between counsel for Plaintiff and counsel for United States to "deem Defendant time served and to further order his release forthwith."

31.  On September 19, 2022, Lynda Moore with U.S. Probation informed Plaintiff's defense counsel that the only way to rectify any custody credit issues would be through a court order modifying his sentence to time-served.

32.  On September 20, 2022, Plaintiff sent an email to Unit Team 1 – "Snyder" insisting that he has not been given his proper time served.

33.  On September 29, 2022, an Order approving the September 19, 2022 stipulation was

issued by the Court releasing Claimant from custody forthwith.

34. On September 29, 2022, First Amended Judgment and Commitment amended to time-served. Immediate release. The federal Court Judge Kimberley J. Muller signed its Order stating in relevant part, "The Court… hereby ORDERS that the judgment entered against the defendant in this matter be amended to indicate that the 33-month term of incarceration has been satisfied, that the defendant is time served, and that he should be released from custody forthwith.

35. At all times since the day of his arrest, September 26, 2018, Plaintiff remained either in state or federal custody until his release September 30, 2022.

36. The Bureau of Prisons set Plaintiff's Release Date as June 24, 2023 which amounted to an incorrect total period of incarceration of 57 months. **At the time of his federal sentencing, March 25, 2021, the parties contemplated that Plaintiff would be "time-served" since he had been in custody since September 26, 2018 and had an accumulation of "good-time credits."** However, his records only showed to have accumulated 35 days of credit despite his federal case pending for nearly three years and he was in custody the entire time. Under the First Step Act enacted December 21, 2018, Plaintiff would earn 54 days of good time credit for every year of his imposed sentence rather than for every year of sentence served. 18 U.S.C. §3264(b). This would have entitled him to 54 + 54 + 40.5 good time credits on his federal sentence to be used towards early release or early supervised release. In addition, he was entitled to earn state good conduct credit under CA Penal Code 2933(b) up to 50% credit off his sentence. And the sentences were running concurrently.

37. Plaintiff was released from custody in or around September 30, 2022, and was homeless.

38. Plaintiff should have been released at a minimum by March 25, 2021, if not earlier. He did not have any disciplinary blemishes on his record which may have reduced any of his

good time or good conduct credits.  Instead, he was wrongfully detained 18 months, at a minimum, beyond his completed sentence.  The following medical consequences could have been avoided as he would have been able to take himself and receive the appropriate and timely medical care he was pleading for due to his serious medical condition.

39.  In 2012, while in custody, Plaintiff developed gangrene in his right leg due to poor circulation and it was amputated.  His persistent complaints of extreme pain in his leg, including inability to stand, all well documented, were ignored by prison medical staff for many months until it was too late to save it.  Since that time, Plaintiff has had an aortic femoral arterial graft which purpose is to provide adequate blood flow to his remaining leg (the left leg).  The graft requires life-long monitoring because it does get clogged and requires a procedure to unclog it.  Since his right leg amputation, Plaintiff has maintained a constant and diligent vigilance to protect his remaining leg.  In this respect, blood circulation is extremely important and must be monitored.  Pain in the limb is an obvious sign of poor blood flow requiring a check of the graft.

40.  In February 2020, while at the USMCF Springfield federal prison, Plaintiff began to experience pain in his left leg reminiscent of the pain he felt before he lost his right leg due to poor blood circulation.  He feared history repeating itself, and began to insist and plead at the federal prison where he was housed to be seen by a *vascular doctor,* one who specializes in his condition, the treatment of arteries and veins.  This would have required a referral to an outside of prison doctor.

41.  In his Administrative Remedy and Appeals (from February 2020 to September 22, 2020), Plaintiff insisted the Physician Assistants ("PA") and the Doctor on staff at the prison were not qualified in vascular medicine and insisted on a referral to a vascular specialist; he further told them he did not want to risk losing his remaining leg by waiting too long, his left leg was in extreme pain, he could not stand, his leg was getting weaker; he suspected a toe was dying

because it was blue and feared developing gangrene; he suspected the aortic femoral arterial graft ("graft") in his left leg was clogged and needed a declotting intervention to the graft so his blood circulation could get back to normal and have no adverse consequences like amputation; he relayed a left foot pulse reading of "86-84" which had been documented by prison medical staff which is "low," and begged for the referral.  He also urged them to look at his UC Davis Hospital Medical Records out of Sacramento, CA showing a history of procedures of declotting interventions to unclog the graft at least 4 times previously since 2015 when the graft was initially placed.  An oxygenation pulse reading under 90 is considered "low" and requires immediate medical attention as it may indicate a severe medical problem.

42.  In response to Plaintiff's insistent requests (Admin. Remedy and Appeals), Warden M.D. Smith (USMCFP Springfield) responded 3-27-2020 that there was no evidence his graft was clogged, and that he had been seen by his primary care doctor and PAs on multiple occasions and his pulses and oxygen flow to the foot were normal.

43.  The Appeal response 2 ½ months later 6-11-2020 by the Regional Director J.E. Krueger concurred with Warden Smith's response that no vascular specialist referral was required and appropriate medical treatment was being given.

44.  An entry on August 11, 2020, documents CT done for Plaintiff's "chronic inf. Aortal/iliac & R axillo femoral graft obst.; Femorals/collaterals patent; Sgn says no Sgy."  No surgery recommended by prison staff.  Around this time Plaintiff told them an ultrasound was the necessary procedure to confirm the obstructed graft.  No ultrasound was performed.

45.  Plaintiff's Administrative Remedy Update dated 8-19-2020 documented his continued requests: "I/M REQUESTS A CONSULT WITH 'VASCULAR' DR."  A handwritten notation on this document states, "9/21/2020/@SPG Contends needs to see vascular specialist for leg graft."

46. On September 16, 2020, Plaintiff had sick call with nurse Jessica Buckle where she notes, "Inmate states, 'I believe my graft is clogged.  My legs both hurt, especially with cold temperatures.'"  Quality of pain: Aching.  "Inmate believes graft is occluded…inmate requesting to see provider."

47.  On September 21, 2020, Dr. Shawn Rice noted, "Involuntary administration of medication remains necessary to prevent relapse or exacerbation of patient's mental illness and of dangerousness associated with it."

48.  The Central Office Appeal response 9-22-20 by Administrator Ian Connors (National Inmate Appeals) indicated he concurred with the manner in which the Warden and Regional Director responded to Plaintiff's concerns.

49.   Plaintiff's Administrative Remedy Update dated 9-22-20 indicated again: "I/M REQUESTS A CONSULT WITH 'VASCULAR' DR."

50.  A summary of Administrative Remedy submission shows "I/M REQUESTS A CONSULT WITH A 'VASCULAR' DR." on 3-30-20, 4-20-20, 6-11-20, 9-22-20.

51.  Plaintiff's Bureau of Prisons Health Services Clinical Encounters also document his repeated complaints of pain and belief that his graft was obstructed causing low blood flow to his extremities especially his left leg which he feared losing.

52.  On September 25, 2020, Dr. Jon Lorenzano referred to Plaintiff as "fixated on his clotted circulation causing him pain…" and Plaintiff requesting an ultrasound which he believed would show his arteries are occluded and causing the blood circulation problem to his left leg and pain.  Dr. Lorenzano documented that he told Plaintiff that there are "collateral vessels around the arteries in his body that are compensating for any decrease in blood flow that is occurring." Plaintiff "complained of having to elevate his left leg a lot because of his pain from lack of blood flow" to which Dr. Lorenzano prescribed Acetamenaphen.  In the Subjective Pain sections of the

report, Dr. Lorenzano documented, "Pain: Not Applicable."

53. As Plaintiff insisted and continually complained throughout 2020 about the pain to his left leg and wanting a vascular doctor referral to unclog his graft, prison psychiatric staff ascribed him with "delusional disorder" and *provisionally*, "bipolar disorder" rather than a serious medical problem.

54. At a time when Plaintiff should have been released (at least by March 25, 2021 if not earlier), Plaintiff was transferred to Federal Correctional Institution ("FCI") Victorville I in California on June 30, 2021.

55. On June 30, 2021, nurse Christine Fields documents that Claimant "is a right-leg-amputee above the knee, painful stump, in wheelchair…. Also, he states he has a stint from his upper body to his legs to bring circulation to his leg; he says he is in pain because it is 'clogged.'" She further documents "Current Medical Conditions:  amputee, circulation issues."

56. On August 10, 2021, Plaintiff was seen by Dr. Saroj Gulani who noted Plaintiff is a "new arrival" with "history of cardiac condition."  He noted, "he is fixated on his 'clotted circulation causing him pain' but I assured him that there were collateral vessels around the arteries in his body that were compensating for any decrease in blood flow that was occurring." He further noted, "I told him he was on Warfarin to keep his graft from clotting.  I talked about the CT that was obtained in 7/20 showing circulation through and around the vessels in question. His ultrasound report shows the arteries were occluded…. He needs follow up visit to vascular surgeon."  He further noted, "he complained of his left leg having to be elevated a lot because of his pain from lack of blood flow.  I assured him that the CT showed that he shouldn't be affected by any pain from his arteries because of the presence of collaterals along the course of his blood flow.  I also told him he was placed on Acetaminophen and Gabapentin to decrease any pain that he felt."  He also noted, "Provisional Diagnosis:  clotting aorto-fem arterial grafts."

57.  On September 21, 2021, Plaintiff was seen by Dr. Saroj Gulani.  He noted that Plaintiff "complains of pain in both legs, due to poor circulation, had graft in abdomen, he is on warfarin, he need to be checked circulation in both extremities, rt leg was amputation in 2012 for gangrene, below the rt knee.  Pt. need circulation check." Provisional diagnosis:  Ultrasound lower extremities and abdominal area.

58. October 7, 2021 – Ultrasound Report – Sono Aid Imaging, Conclusions and Findings indicated as follows:  1. The abdominal aorta in the mid and distal portions is decreased in diameter and occluded. 2. Axillofemoral bypass graft is noted.  No flow detected in the graft. There is no evidence of abdominal aorta dilatation as visualized from the proximal aorta to the iliac bifurcation.

59.  On October 22, 2021, Plaintiff was seen by Dr. Saroj Gulani.  The chief complaint was noted to be "Vascular.  Pain in lower extremities due to poor circulation, had graft in abdomen."  Notes "right leg amputation in 2012 for gangrene below the knee. Pt. need circulation." "Ultrasound of abdomen reveals - REPORT – 1. The abdominal aorta in the mid and distal portions is decreased in diameter and occluded Axillofemoral bypass graft is noted. No flow detected in the graft.  Limbs--Severely decreased monophasic flow is noted in the lower extremity arteries bilaterally; 2. No flow detected in the left PTA; 3. The ankle/brachial Index on the left is severely decreased.  Need to refer to Vascular surgeon.  Provisional Diagnosis: Aorta occluded.  Target Date:  Vascular Surgery 10/26/2021 Priority: Urgent.

60.  On November 4, 2021, there was follow up with Dr. Saroj Gulani.  Dr. noted, "Pt. has poor circulation, unable to stand up, ultrasound REPORT – the abdominal aorta in the mid and distal portions is decreased in diameter and occluded.  Axillofemoral bypass graft is noted.  No flow detected in the graft.  Limbs – severely decreased monophasic flow is noted in the lower extremity arteries bilaterally. 2. No flow detected in the left PTA.  3 The ankle/brachial index on

the left is severely decreased.  Need to refer to vascular surgeon again.

61.  On November 18, 2021, C. Madrigal, PharmD, noted that Plaintiff complained 11/4/22 of "pain in leg and awaiting consult with vascular surgeon and being monitored by institution providers."

62.  On November 18, 2021, Plaintiff had follow-up with Dr. Gulani who reviewed chart notations from October 22 and November 4, 2021 notating the same findings of the Ultrasound REPORT and noting again "need to refer to Vascular surgeon (Dr. Suval he is retired)."

63.  On December 1, 2021, Plaintiff had follow-up with Dr. Gulani who noted that Plaintiff complains of pain in BLE (both lower extremities) described as cramping and aching." Dr. noted that Plaintiff was seen by Vascular Surgeon "for Graft and swollen both lower legs" and who recommends CT Scan of chest, abdomen, pelvis, and BLE with runoff.

64.  On January 19, 2022, Plaintiff requested counselor LaKeisha Campbell to get records to get accurate release date.

65.  February 22, 2022, review of CT Report of Claimant's abdomen/pelvis revealed:  1. Occluded infrarenal abdominal aorta and bilateral common and external iliac arteries 2. Occluded right axillary - bilateral lower extremity bypass graft. 3. Reconstitution of the bilateral femoral and internal iliac arteries through the collaterals. 4. Subsegmental right middle lobe atelectasis. 5. Diffuse hepatic steatosis. Pt. referred to Desert Valley Hospital for urgent evaluation. ER – Urgent.  Provisional Diagnosis: Urgent evaluation.

66.  A February 22, 2022, Administrative Note documented a call from radiology department at Desert Valley Hospital "with the abnormal CT scan of the abdomen and pelvis revealing there is an occluded stent left iliac artery, patient is referred to the Desert Valley Hospital for further assessment."  Plaintiff admitted to hospital.

67.  On February 25, 2022, Plaintiff underwent "failed right axillary femoral bypass

revascularization procedure."

68. On March 3, 2022, Plaintiff underwent surgery Aorto Bifemoral Bypass with Dacron graft at Mountain View Hospital due to aortic occlusion (clogged) to redirect blood flow around a large, narrowed, or blocked artery in groin or abdomen to increase blood flow to the legs. Dr. Huey McDaniel, Mountainview Medical Hospital, Las Vegas did the surgery. This was a major surgery, usually done if in danger of losing a leg or if symptoms are severe. A dacron graft made of synthetic polyester material replaced the existing graft.

69. In the past at UC Davis Hospital in Sacramento, CA, Plainitff's graft occlusion was treated by a non-invasive "thrombolysis" procedure which breaks up blood clots in the graft using medication, *not* replacement of the graft as was done in this instance. This procedure was done several times since the graft placement in 2015 and Plaintiff repeatedly told this to BOP staff when he pleaded with them early on to have his graft checked for clotting.

70. On March 9, 2022, Plaintiff was discharged back to FCI Victorville I prison from Mountainview Hospital Las Vegas.

71. On April 4, 2022, Plaintiff complained of pain and serous drainage from two surgical wounds and "fever at night."

72. On April 11, 2022, Plaintiff reported drainage and pus. Provisional diagnosis: Post-op wound infection dacron graft infection.

73. On April 15, 2022, Plaintiff reported to Health Services with burning abdominal pain and left leg pain of 9 out of 10.

74. On April 27, 2022, medical notes indicated, Plaintiff complained of continued pain. Left leg was now swollen and painful. Increasing drainage at surgical wounds. Notes indicate Plaintiff has been sent to ARMC multiple times with no resolution except recommending that Plaintiff follow up with vascular surgeon who performed original surgery at Mountainview

-13-
COMPLAINT

Hospital in Las Vegas.  Current ASSESSMENT: Bacterial infection, unspecified, A499 - Current - *dacron graft infection.*  Vascular Surgery, Target Date Scheduled Date 04/29/2022.  Priority: Urgent.  All pus discharge is frank and obvious. All signs of deep wound infection with sinus tracts have worsened since last exam on 4/11. Infected aorto-bifemoral graft, worsening. New onset pitting edema. New onset non-palpable pulses.  New onset leg ischemia with impending infarction. Provisional Diagnosis: Infected aorto-bifemoral graft, worsening. Disposition: Return Immediately if Condition Worsens.  Other: This inmate needs to be urgently sent back to Mountainview Hospital in Las Vegas.

75.  On May 1, 2022, Plaintiff was admitted to Mountainview Hospital in Las Vegas. Awaiting surgery which was to be a "re-do of the aorto-bifemoral graft" which was done March 3, 2022.

76.  On May 5, 2022, pre-surgery, Dr. Huey McDaniel notes indicate he told patient/Claimant "20% mortality rate and 15% chance of losing left leg…. [patient] is understandably not happy with these odds, but he should also have the option of requesting care elsewhere."

77.  On May 11, 2022, Warden N.T. McKinney approved an emergency phone call by Plaintiff who wanted to call his family due to extreme risk of next surgery and risk of death.

78.  On May 17, 2022, Plaintiff underwent surgery to re-do aorto-bifemoral graft.

79.  On June 2, 2022, Plaintiff underwent exploratory laparotomy via previous midline incision, debridement of lower left quadrant (LLQ) abscess and necrotic large bowel, abdominal washout with three peritoneal drains, placement of a wound VAC and an end colostomy of the transverse colon in the right upper quadrant abdomen (RUQ).

80.  The delay in getting Plaintiff to an outside provider for treatment of his occluded aortic graft caused him to require the more invasive surgery in March 2022, instead of the non-

invasive thrombolysis procedure he had undergone in the past.  The infection caused by the March 2022 surgery and the re-do in May 2022, ultimately contributed to the death of his colon tissue (necrotic large bowel) requiring the placement of the colostomy and which to this day is causing him complications and is likely permanent.

81.  For the next several months, Plaintiff had to recover in prison at FCI Victorville I, enduring pain, discomfort, and extreme anxiety living his new reality with a colostomy bag.

82.  At a time when Plaintiff should have been out of custody, he underwent serious, life-altering, and permanent consequences due to the replacement of his aorto-bifemoral graft which became infected, having to be re-done, and leading to the placement of a colostomy bag due to another complication.  He was deprived of the ability to consult a doctor of his choice, obtain second opinions, solicit the help of family who may have assisted him.  He endured significant pain and suffering as he waited for many months before he was referred to a vascular specialist consultation as staff at BOP did not give the importance required to Plaintiff's serious medical condition. He endured significant pain and suffering as he had to return to prison for several more months to recover from major surgery and adjust to his new life with a colostomy bag, before his release date was finally re-calculated correctly and was released in late 2022.

83.  Since his release from prison, Plaintiff has sought medical consultations to discuss the reversal of the colostomy and has been told that an attempt to reverse it could be fatal.  In the meantime, he has suffered other life altering complications as a direct result of these procedures.

84.  Had he been out of prison as he was supposed to be, Plaintiff would have gone back to UC Davis in Sacramento where he had several times already had his graft unclogged with non-invasive medication and not full-on surgical replacement which led to these permanent and life-altering complications after infection and re-do of the graft surgery. Now, he has a permanent colostomy which affects all of his daily activities.  It emits a foul odor, it leaks.  He developed a

-15-
COMPLAINT

hernia as a result of these procedures and other medical issues related to his sexual function. Plaintiff cannot help but feel depressed and anxious at his current physical condition.

85.  Plaintiff suffered from depression and anxiety and mental anguish while he was wrongfully confined, coupled with having to deal with a serious medical condition that staff did not believe was serious enough to warrant a referral to a vascular specialist outside the prison at a time he should have already been out of prison.

86.  The actions of BOP employees were negligent, wrongful, intentional, and/or reckless. The BOP employees were acting within the course and scope of their employment the Bureau of Prisons, an agency of the United States when they did the acts complained of herein.

87.  Plaintiff timely submitted his administrative Claim for Damages to the Federal Bureau of Prisons before filing this action.  The claim was acknowledged as received and no action taken to resolve administratively within the required time period.  This action was filed.

### COUNT I

**NEGLIGENCE**
**Pursuant To Federal Tort Claims Act, 28 U.S.C. §2671 Et Seq.**

**(By Plaintiff against Defendant United States)**

88.  The allegations contained in paragraphs 1 through 87 are incorporated herein by reference as if set forth here in their entirety.

89.  As alleged above, BOP staff at the federal prison had a duty to act with reasonable care and not subject Plaintiff to personal injury during the course of their duties.

90.  BOP staff at the federal prison had a duty not to deprive Plaintiff of liberty without due process.  Specifically, they had a duty to not continue to detain Plaintiff where he had completed his prison sentence and paid his debt to society.

91.  BOP staff at the federal prison had a duty to act with reasonable care in calculating

Plaintiff's custody release date and promptly correct any mistakes in compliance with governing laws and policies.

92. BOP staff at the federal prison had a duty to act with reasonable care in calculating Plaintiff's prison sentence, apply good time credits as established by the First Step Act, and promptly correct any mistakes.

93. BOP staff at the federal prison had a duty to act with reasonable care to promptly and meaningfully examine Plaintiff's claim regarding an incorrect calculation of custody release date, and promptly correct it.

94. BOP staff at the federal prison had a duty to address a serious medical condition in a timely manner.

95. BOP staff at the federal prison breached their duties as set forth above while in the course and scope of their employment with Defendant.

96. As a proximate and reasonably foreseeable result of the BOP employees' actions and omissions, Plaintiff suffered personal injuries to his person, and not less than two years of unlawful detention and imprisonment, loss of liberty, loss of enjoyment of life, mental pain and suffering, psychological anguish, anxiety, humiliation, physical injury, shock, confusion, nervousness, fright, worry; continued post-incarceration emotional distress as a result of the unlawful over-detention and permanent medical/physical complications. BOP employees' actions and omissions were a substantial factor in causing the harm alleged above to Plaintiff.

97. At all times during Plaintiff's unlawful detention, BOP staff and staff at DSCC were employees of the United States acting within the course and scope of their employment. Defendant United States, therefore, is liable for the actions of the BOP and DSCC staff under the FTCA for negligence.

98. Plaintiff suffered from physical and mental pain and suffering, anxiety, and

depression while he was unlawfully detained.  As a result of the actions of BOP and its employees, Plaintiff suffered mental pain and suffering, humiliation, emotional and psychological trauma, degradation, emotional distress, shock, worry, fright, humiliation, anguish, confusion, anxiety, nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, and other non-economic losses. He also suffered significant physical injury by the botched graft replacement which became infected, had to be re-done, and then ended up with a permanent colostomy bag and other physical complications.  He continues to suffer emotional pain and suffering after his release as a result of all of the above. He will continue to suffer the psychological effects of this forced incarceration and now permanent physical condition of a colostomy bag for the rest of his life, and other physical complications, which entitles him to future mental pain and suffering damages.

## COUNT II

### FALSE IMPRISONMENT
**Pursuant to Federal Tort Claims Act, 28 U.S.C. §2671 et seq.**

#### (By Plaintiff against Defendant United States)

99.  The allegations contained in paragraphs 1 through 98 are incorporated herein by reference as if set forth here in their entirety.

100.  BOP staff caused Plaintiff to continue to be detained without legal justification beyond the end of his completed prison sentence and was not released until approximately September 30, 2022 – an over detention of not less than 2 years.

101.  Plaintiff was aware of his over detention and did not consent to it.

102.  At all times during Plaintiff's over-detention, BOP staff and staff at DSCC were aware, or reasonably should have been aware, that they lacked the authority to continue to detain Plaintiff under the governing laws and policies, that their conduct was unlawful, and not

-18-
COMPLAINT

otherwise privileged.

103.  As a proximate and reasonably foreseeable result of the BOP employees' actions and omissions, Plaintiff suffered personal injuries, unlawful detention and imprisonment, loss of liberty, loss of enjoyment of life, mental pain and suffering, psychological anguish, anxiety, humiliation, shock, confusion, nervousness, fright, worry; continued post-incarceration emotional distress as a result of the unlawful over-detention, and personal injuries; BOP employees' actions and omissions were a substantial factor in causing harm to Plaintiff.

104.  At all times during Plaintiff's unlawful detention, BOP staff and staff at DSCC were employees of the United States acting within the course and scope of their employment. Defendant United States, therefore, is liable for the actions of the BOP staff under the FTCA for false imprisonment.

105.  Plaintiff suffered from physical and mental pain and suffering, anxiety, and depression while he was unlawfully detained.  As a result of the actions of BOP and its employees, Plaintiff suffered mental pain and suffering, humiliation, emotional and psychological trauma, degradation, emotional distress, shock, worry, fright, humiliation, anguish, confusion, anxiety, nervousness, loss of enjoyment of life, inconvenience, embarrassment, apprehension, and other non-economic losses. He also suffered significant physical injury by the botched graft replacement which became infected, had to be re-done, and then ended up with a permanent colostomy bag and other physical complications.  He continues to suffer emotional pain and suffering after his release as a result of all of the above. He will continue to suffer the psychological effects of this forced incarceration and now permanent physical condition of a colostomy bag for the rest of his life, and other physical complications, which entitles him to future mental pain and suffering damages.

-19-

COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment as follows:

1.  Declaring that defendant United States is liable for the negligence of its employees including those employees at USMCFP, FCI Victorville I, and DSCC acting within the course and scope of their employment for the United States;

2.  Awarding compensatory damages to Plaintiff against United States under the FTCA (28 U.S.C. §2674);

3.  Awarding reasonable attorney's fees to Plaintiff *if permitted by any applicable law*, including but not limited to 28 U.S.C. §§2412(b) and 2412(d)(1)(A);

4.  Awarding costs to plaintiff;

5. Granting such other relief as the Court may deem just and proper under the circumstances.

Dated:  November 30, 2024

LAW OFFICES OF CLAUDIA C. BOHORQUEZ

By: _____
Claudia C. Bohorquez, Esq.
Attorney for Plaintiff